## Esrom Mayer et al. v. William J. McCann.

### Gen. No. 4,848.

1. VERDICT—*when not disturbed.* A verdict will not be set aside on the ground that it is against the weight of the evidence unless clearly and manifestly so.

2. REAL ESTATE COMMISSIONS—*who entitled to.* While an agent employed to sell land must find a purchaser ready, able and willing to buy on the terms proposed before he has earned his commission, that rule does not apply to one who is only hired to render the preliminary service of introducing the seller to persons who shall afterwards buy.

Assumpsit. Appeal from the Circuit Court of Stephenson County; the Hon. RICHARD S. FARRAND, Judge, presiding. Heard in this court at the April term, 1907. Affirmed. Opinion filed October 10, 1907.

**Statement by the Court.** Appellee sued appellants to recover twenty-five cents per acre on the sale of 11,173 acres of land in North Dakota, and recovered a verdict and a judgment for $2,793.25, the exact amount claimed. Plaintiff filed an amended declaration, consisting of the consolidated common counts and three amended counts, and afterwards a reamended fourth count. The amended second count charged that appellants agreed with appellee that if appellee would assist in securing a purchaser for certain lands in North Dakota, they would pay appellee, for his commission for assisting in securing said purchaser, twenty-five cents per acre for all land so sold, and that plaintiff did assist in procuring a purchaser who was accepted by appellants, and who purchased from appellants 11,173 acres of said land. The amended third count charged that appellants requested appellee to work for them in assisting to sell certains lands in North Dakota, by introducing them to prospective purchasers, and agreed to pay appellee twenty-five cents per acre upon all land sold by appellants to purchasers introduced to them by appellee, and that afterwards appellee introduced to appellants Henry Brockmeier as a prospective purchaser for said lands, and appellants sold Brockmeier 11,173 acres of said lands. The reamended fourth count charged that appellant Parsons requested appellee to assist in selling certain lands in North Dakota, by introducing him, said Parsons, to prospective purchasers, and that Parsons agreed to pay appellee twenty-five cents per acre upon all land sold by him to purchasers introduced to him by appellee, and that afterwards Parsons and Mayer formed a partner-

ship for the sale of said land, and with knowledge of said
contract and the terms thereof, each of said partners and
appellee agreed to the terms of said contract, and assumed
the same as the contract of the partnership, in consideration
of appellee assisting to sell said lands for said partnership,
according to the terms of said contract with Parsons, and
that afterwards appellee introduced to appellants a prospec-
tive purchaser for said lands, one Henry Brockmeier, and
that appellants afterwards sold Brockmeier 11,173 acres of
said land.   A bill of particulars located the land in Het-
tinger county.   Parsons filed the general issue, and a spe-
cial plea that the contract was that plaintiff was to assist
in selling certain lands in North Dakota by introducing said
Parsons to prospective purchasers of said lands, which pros-
pective purchasers, by reason of such introduction by ap-
pellee, would thereupon purchase said lands; that appellee
introduced Parsons to Brockmeier as a prospective pur-
chaser, but that said Brockmeier, at the time appellee so
introduced Parsons to Brockmeier, was not a prospective
purchaser of said lands who, by reason of such introduc-
tion, would thereupon purchase said lands, and that Parsons
did not, as a result of such introduction, sell said lands, or
any part thereof, to Brockmeier; whereby said introduction
by appellee was of no value and assistance to Parsons in
the sale of said lands, and so the consideration for said agree-
ment to pay appellee twenty-five cents per acre has wholly
failed.   Parsons filed a further special plea, to the effect
that appellee agreed to assist Parsons in securing a purchaser
for said land, and, pretending to do so, introduced Parsons
to Brockmeier as a prospective purchaser; that appellee, by
means of said introduction, did not assist Parsons in the sale
of said land, and that Brockmeier at that time was not a
prospective purchaser, ready, able and willing to purchase
said land; whereby said pretended assistance was of no use
or value to Parsons, and that Parsons did not sell Brock-
meier said lands by reason of said assistance of said ap-
pellee, and so the consideration for said agreement has
wholly failed.   As to these pleas by Parsons, appellee filed

replications traversing the allegations of the pleas. The pleas filed by Mayer to the original declaration stood as his pleas to the amended declaration. The pleas by Mayer were under oath. He pleaded the general issue, and special pleas denying that he with Parsons undertook and promised as in the first and second counts alleged, and alleging that he is not and never was jointly liable with Parsons in respect to said causes of action.

Louis H. Burrell and Robert B. Mitchell, for appellants.

Douglas Pattison, for appellee.

Mr. Justice Dibell delivered the opinion of the court.

Appellants contend that it was necessary that appellee should have been the procuring cause of the sale, in order to entitle him to recover, and that the proof shows that he was not; and that appellee failed to show that Mayer was liable jointly with Parsons.

The proof shows that appellee and appellants lived in Freeport; that the lands in North Dakota in question were owned by the Northwestern Improvement Company; that said company had given a contract for the sale of said lands to Carl Farup and his associates; that Carl Farup and his associates had given a contract for the sale of said lands to the Nason-Christofferson Company of St. Paul; that appellants were partners in the business of acting as agents for the sale of real estate, and were agents of the Nason-Christofferson Company for the sale of these lands, and that the usual commissions for making sales of such lands were one dollar per acre; that Parsons was the active, outdoor man of the firm of E. Mayer & Company, and was comparatively a stranger in Stephenson county; that appellee was an old resident in that county, and well acquainted, and was in the business of selling pianos, sewing machines, and real estate.

The testimony favorable to appellee tended to show that appellee, in October, 1903, received two postal cards, signed

Mayer v. McCann.

by Parsons, the second of which asked him to call at Mayer's office, as Mayer wanted to see him; that appellee did call, in response to said postal, about the 12th of October; that Mayer, whom appellee knew, was in the office, and appellee made known his receipt of said postal, and Mayer told him that Parsons wanted to see him; and he asked Mayer who Parsons was, and Mayer answered that he was his partner in the western land business, and that Parsons had seen some of appellee's advertisements, and wanted to get appellee to work in conjunction with him in selling North Dakota land, and that he had inquired, and had found that appellee was well acquainted over the county; that Parsons was responsible, and was a partner of Mayer under the name of E. Mayer & Company, and that any deal that appellee made with Parsons would be satisfactory to Mayer. Later the same day, appellee called again, and met Parsons, and Parsons explained their business of selling the North Dakota land, and how they had sold certain land to certain parties in that county, and that if appellee could introduce him to anyone that appellee thought was able and would buy any land, they would give appellee twenty-five cents an acre. Appellee said to Parsons, "It takes a long time to close up one of these big deals." Parsons answered, "Sometimes it takes a year or two, but when you do close one, it counts." Mayer then came into the office, and the subject was talked over again, and Mayer said to appellee, "You go out and introduce Parsons to any of these parties that you know have money enough to handle one of these big pieces of land, and we will give you twenty-five cents an acre on any deal you make, or any deal you introduce him to." Appellee agreed, and asked what he was expected to do, and Parsons said, "All you have to do is to introduce us." Appellee told them that he had a party in view that he thought could be got and that he thought they would be able to sell some land to, and arranged to go with Parsons next day. On cross-examination appellee stated that in that first conversation, Parsons said that he would give appellee twenty-five cents an acre if appellee introduced him to anybody that would eventually buy the land. Ap-

pellee also testified that during that conversation Mayer told appellee that they sold their land mostly through Nason and Christofferson of St. Paul, and usually figured on a dollar an acre commission. The next day Parsons got a team, and he and appellee drove to Elroy, where appellee told Parsons there were some people by the name of Medica to whom he had been talking, and whom he believed he could get interested in land. They visited these parties for that purpose. The next day appellee was going to take Parsons to see some people by the name of Althof, but Parsons had business in another direction, and Mayer told appellee to go himself and see the Althofs and anyone else and then afterwards, if there was any possibility of a deal, he could take Parsons out and introduce him. A day or two later, appellee took Parsons to Stockton to the Finkender brothers, who were wealthy farmers, and discussed this land with them, and they promised to go out to North Dakota and see it. Either Mr. Christofferson or Mr. Nason came to Freeport and appellee took him out to see various parties on several occasions, and at those times had conversations with Mayer in regard to prospective deals. During that time, appellants sold some Dakota lands to one Coffman, and Mayer figured out on a piece of paper and showed appellee what he would have made at twenty-five cents an acre if he had been in on that deal, which included some six or seven thousand acres. About November 1st appellee was in appellants' office, and said to Mayer and to Parsons that he believed they could get the Brockmeier brothers interested in a piece of land; that John Brockmeier had been figuring for some land in South Dakota, and if he failed to get it, he probably would go up to North Dakota and look at their land; and Mayer told appellee to see them, but not to let them know that he, Mayer, was in the deal, as there was a misunderstanding between him and the Brockmeiers. Appellee told Parsons that Will Neese and John Brockmeier were intimate, and that John Brockmeier talked with Neese on every business transaction he had, and it would be a good thing to get Neese interested to see John Brockmeier, and

appellee took Parsons to Neese and introduced him to him, and Parsons told Neese that if he could get John Brockmeier interested, they would give him twenty-five cents an acre, and then said to appellee, "If you get Henry Brockmeier interested, we will give you as we promised before," and told Neese that they had promised McCann twenty-five cents an acre. About December 8th or 9th, 1903, Henry Brockmeier was having a public sale, and appellee told Parsons that they had better go there and see Henry Brockmeier, and possibly the other brother would be there, and they might want to buy together. Appellee took Parsons to the sale and introduced him to Henry Brockmeier, and told the latter that this was the man that had sold certain other parties, whom he named to Brockmeier, a large tract of land, and that he wanted to get Henry Brockmeier interested in going up and looking at the land, and buying a piece. Henry Brockmeier answered that he was too busy that day to talk land, and they would have to come back again. Soon after that, Parsons went away to spend the winter, and came back about April, 1904. During that interval, appellee was at Mayer's office a couple of times a week, talking over prospects for the sale of land. Appellee told Mayer of a man named Snyder that had sold some property and was going to make an investment, and that as soon as Parsons got back he would go and see him, and Mayer told him to keep those persons in mind until Parsons got back, and then to see them, or to see them then and see whether there was any use of Parsons going to see them. In May, 1904, Parsons telephoned appellee to meet him and either Christofferson or Nason at a hotel, and he did so, and in the conversation that followed, appellee told them that they had better go and see Brockmeier again; that he felt like going out to North Dakota; and they said they would. The next evening appellee met these parties again, and they had been out in the country to see Brockmeier, and said there was not much use of trying to get him to go to Dakota at that time, but that they might get him out later. In September, 1904, appellee met Henry Brock-

meier on a train.    Appellee was going to Dakota and Brock-
meier was going to Iowa.    Appellee asked Brockmeier if he
had made up his mind to buy that North Dakota land yet,
and Brockmeier said he wanted to go and see it first, and
asked, "Who is this man Parsons that you introduced me
to?"    Appellee told him who Parsons was, and suggested
that he see one Lacey, at Freeport, who knew Parsons better
than anyone else, and told him that he could depend entirely
on what Lacey might tell him in regard to Parsons.    Ap-
pellee then told Brockmeier that he thought it would pay
him to go up there and invest in that land at the price at
which it was held; that he had been up through that coun-
try, and had heard a great deal about the land in North
Dakota, and that at the price given, Brockmeier could not
lose anything upon it.    When appellee returned to Free-
port, less than a week later, he went to Parsons, and told
him he had better go down and see Brockmeier; that the
way Brockmeier talked he thought that he had a notion of go-
ing out to Dakota.    Parsons agreed to go and see Brockmeier.
In November, 1904, appellee saw Brockmeier again, and
Brockmeier told him that he was going out to look at that
land with that man Parsons to whom appellee had introduced
him.    The land was in fact sold to Henry Brockmeier soon
thereafter.    Parsons went away for the winter, and appel-
lee did not see him again till the last week in February, but
during that interval appellee saw Mayer, and Mayer told
him that they had closed up the Brockmeier deal, or were
just about closing it up.    Appellee met Parsons on the
street the last week in February, 1905, and Parsons told
appellee that they closed up the Brockmeier deal before he
went away, and appellee asked, "When do I get my commis-
sion?"    Parsons answered, "Well, he makes a payment the
first of March and then you get your commission."    They
went into the post office together, and Parsons figured out on
an envelope what appellee's commission would amount to,
and figured it at $2,793, telling appellee that Brockmeier
bought 11,173 acres.    Soon after this appellee needed some
money, and went to the office and asked Mayer to loan him

some money on this commission, and at first Mayer said he would, and afterwards he talked with Parsons, and came back and said, "Brockmeier has not paid for that land yet. It we let you have the money, you will have to give us some other security." But Mayer told appellee then that he would get his commission as soon as Brockmeier paid for the land. Thereupon appellee borrowed of Mayer $460 or $465 and gave a real estate mortgage securing the loan which was foreclosed after the commencement of this suit. After this interview, appellee frequently went to the office and asked whether the money had come yet; whether Brockmeier had paid for the land yet; sometimes having this conversation with Mayer and sometimes with Parsons; and the answer would be, "No, he has not paid for it yet." Still later, he asked Parsons when he was going to get his commission, and Parsons said, "There is a note up at St. Paul for $5,800, and your commission will have to come out of that. It is due now, and ought to be paid now." Appellee understood this to be a note given by Henry Brockmeier. Soon after this Mayer asked appellee to go with Parsons to see a Mr. Clinger, who had considerable money on hand, and see if they could not get him to invest in North Dakota land, and they went next day and made that visit. Soon after, appellee went to the office and asked if his money had not come yet, and Mayer told him that they could not pay him until they got their own, and asked appellee what he expected out of this, and appellee told Mayer that he expected what his contract called for. Mayer said, "We did not get that much out of it ourselves." A few days later, after a similar conversation, Mayer turned him over to Parsons. Parsons told him that this had been a very expensive deal to them, and had cost them a good deal of money and that they had only made about $500 out of it, and would give him $250, and he refused. He returned a few days later, and had a similar conversation, in which Parsons told appellee that they had absolute control of the sale of this land to Brockmeier, and would make two dollars an acre out of every acre that was sold.

Parsons testified that in the first conversation with appellee he told appellee he would give him twenty-five cents an acre for any wholesale sales that he would make or purchasers that he would furnish, or, as he put it on cross-examination, that "If he had any purchasers that were willing to buy that kind of tracts, if he would introduce me, and I got any business out of it, I would give him twenty-five cents an acre for purchasers." Parsons admitted that appellee introduced him to Henry Brockmeier at the time and place stated by appellee. Appellants introduced evidence tending to show that Brockmeier did not remember being introduced to Parsons by appellee, and that he became interested in the purchase of these lands afterwards by the efforts of other parties, and that the conversations between appellee and Brockmeier were not in regard to these lands. Parsons did not deny the testimony of appellee that he figured out to appellee the exact amount of his commissions on this sale, and figured it at $2,793, nor did he deny any of the promises to pay appellee as soon as they got their money. Mayer did not testify, and therefore the promises and statements which appellee testified were made to him by Mayer were not denied by any witness.

It is evident that according to the testimony introduced by appellee, all that he was to do in order to earn a commission of twenty-five cents per acre was to introduce appellants or Parsons to some person who should afterwards purchase the lands, and that he was employed for this purpose because he was intimately acquainted in the county, while Parsons, who did the outside work for appellants, had only been in the county about three years, and was a comparative stranger, and that appellants considered that appellee, by reason of his long acquaintance in the county, and by reason of his being in the real estate business would be likely to know men who could be interested in the purchase of large tracts of land in North Dakota. It is obvious that there would be but a few people in Stephenson county who could be interested in so large an enterprise. It is evident, also, that the evidence introduced by appellee tends to show

Mayer v. McCann.

that he did very much more towards securing a sale of this property to Henry Brockmeier than merely to introduce Parsons to him; that he labored with Brockmeier, and that he also urged Parsons to go and see Brockmeier at a time when appellants were of the opinion that they could accomplish nothing with him. It is clear to us that if appellee's testimony was believed by the jury, it authorized a finding in his favor under the common counts.

While it is generally true that a real estate agent employed to sell land must find a purchaser ready, able and willing to purchase on the terms proposed, before he has earned his commission, yet that rule does not debar the parties from making a different contract. The evidence here shows that the usual commission for the sale of such lands was one dollar per acre, and it is evident that appellants were not hiring appellee to sell the land, but only to render preliminary services. It was for the jury to decide whether appellee's version of the contract and of the service rendered was sustained by a preponderance of the evidence. They have found for appellee, and the trial court, who saw and heard the witnesses, has approved that finding. We do not feel authorized to set it aside.

Complaint is made of some rulings upon the testimony, and of the refusal of some instructions requested by appellants. We are of opinion that the rulings upon testimony were as favorable to appellants as they should have been, and that the jury were properly instructed on behalf of appellants, but perhaps more strongly in their favor than they were entitled to.

We find no substantial error in the record. The judgment is therefore affirmed.

*Affirmed.*